UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE RAMSER, | Case No.: 15-CV-2018-CAB-DHB |
| Plaintiff, | |
| v. | **ORDER GRANTING UNIVERSITY OF SAN DIEGO'S MOTION FOR SUMMARY JUDGMENT** |
| RICKY LAIELLI; UNIVERSITY OF SAN DIEGO, a California corporation; and DOES 1-20, | |
| Defendants. | [Doc. No. 87] |

This matter is before this Court the motion for summary judgment of Defendant University of San Diego ("USD"). The motion has been fully briefed, and the Court held oral argument on August 3, 2017. For the following reasons, the motion is granted.

## I. General Background

This case is about USD's handling of Plaintiff's claim that she was raped by fellow USD student Ricky Laielli in the early morning hours of February 9, 2014, in Plaintiff's dormitory room. It is not a case about whether USD created an environment on campus that led to the alleged rape, or about whether USD is liable for the alleged rape itself. As such, details and disputes about what actually happened between Plaintiff and Laielli in

Plaintiff's dorm room shortly after midnight on February 9, 2014, are largely irrelevant to the instant motion. What is relevant, and the primary issue raised in USD's motion for summary judgment, is whether USD was "deliberately indifferent" to Plaintiff's report that Laielli sexually assaulted her. As such, the relevant issues include when USD had actual notice of the assault and the actions it took in response. The material facts relevant to these questions are largely undisputed, but to the extent there is a dispute, the Court construes the evidence in favor of Plaintiff.

## A. USD Policy For Responding to Violent Crimes

In 1999, USD and the San Diego Police Department (SDPD) agreed to a Memorandum of Understanding (the "1999 MOU") regarding crime reporting and criminal investigation responsibilities between SDPD and USD's Department of Public Safety (DPS). [Doc. No. 87-1 at 676.] The MOU stated that "SDPD will be the primary reporting and investigating agency for ALL violent crimes" including forcible rape. [*Id.*] In 2013, USD, SDPD, and Center for Community Solutions (CCS)[1] entered into a second MOU (the "2013 MOU") to "clearly articulate[] the responsibility and process through which [DPS] reports all felonious activity on campus, including incidents of sexual assault . . . ." [*Id.* at 682.] The 2013 MOU recognized that USD CARE advocates would act as first responders to victims of sexual violence and that SDPD would engage with complainants once a report is made. [*Id.*] The 2013 MOU was signed by the San Diego Chief of Police. [*Id.* at 683.]

## B. The Assault

On the night of February 8, 2014, Plaintiff, her roommates, the boyfriend of one of her roommates, and Defendant Ricky Laielli were drinking and socializing in Plaintiff's dorm room on the USD campus. Sometime around midnight the others left or went to bed, leaving Plaintiff and Laielli in the living room. Around this time, Plaintiff drank part of a mimosa Laielli made for her and shortly thereafter began to feel nauseous and dizzy.

---

[1] CCS is a nonprofit agency that provides emergency services to those affected by rape, domestic violence, and elder abuse. [Doc. No. 87-1 at 682.]

Plaintiff believes that she felt this way because Laielli put a drug into the mimosa. According to Plaintiff, while they were alone Laielli raped her.

## C. Plaintiff Reports the Assault to USD Security

At approximately 1:45 a.m., Plaintiff left the dormitory and called her friend Samantha Laplante to pick her up. [Doc. No. 87-1 at 53; Doc. No. 91-2 at 61-63.][2] Laplante, accompanied by her friend Jennifer Goldman, took Plaintiff to the nearby Manchester Village parking garage where she located DPS officer Matthew Skillings. [Doc. No. 87-1 at 53, 86; Doc. No. 91-2 at 64-70.] Laplante testified that she told Skillings that Plaintiff "had said some guy had drugged her and was trying to have sex with her." [Doc. No. 87-1 at 328.] Plaintiff testified that she told Skillings she had been raped at this point. [Doc. No. 87-1 at 53-54; Doc. No. 91-9 ¶ 11.] Plaintiff, Laplante, and Goldman all state that Plaintiff asked Skillings to call the police. [Doc. No. 87-1 at 53-54, 330; Doc. No. 91-8 ¶ 5.] Plaintiff and Goldman state that Skillings initially responded by attempting to dissuade her from involving the police. [Doc. No. 87-1 at 599; Doc. No. 91-8 ¶ 5; Doc. No. 91-9 ¶ 11.] Skillings then called paramedics and contacted USD Community Director Jennifer Lee. [Doc. No. 87-1 at 90-91, 365-66; Doc. No. 87-11 at 9.]

Lee soon arrived at the scene and spoke to both Laplante and Plaintiff. Laplante told Lee that Plaintiff believed she had been drugged and that a guy was trying to have sex with her. [Doc. No. 87-1 at 329, 367.] Lee then asked Plaintiff if "something more" may have happened, and Plaintiff responded by nodding. [*Id.* at 368.] This conversation ended because the paramedics began putting Plaintiff on a stretcher. [*Id.*] Lee then asked DPS to contact a CARE[3] advocate. [*Id.* at 369-70.]

## D. DPS Goes to Plaintiff's Dormitory Room

DPS officer Jason Baker arrived at the Manchester Village parking garage around

---

[2] All pinpoint citations to the record are to the ECF page number that appears on the top of the page.

[3] CARE stands for Campus Assault Resources and Education. A CARE advocate is trained to provide information to victims of sexual assault about their options of involving law enforcement and the availability of counseling. [Doc. No. 87-5 at 2.]

1:55 a.m. Once there, he learned that Plaintiff's friend (Laplante) had said that she thought Plaintiff had been drugged. [Doc. No. 91-3 at 61, 86-89.] Baker then went to Plaintiff's dorm to see if he could identify what she had ingested. [*Id.* at 61-64.] Baker was not yet aware of Plaintiff's claim that she had been raped. [*Id.* 61-64, 81-82] After knocking on Plaintiff's dormitory door and getting no response, Baker let himself in using his security key. [*Id.* at 66.]

Inside, Baker found alcohol bottles on the table and the TV on. [*Id.* at 66.] He announced his presence loudly and eventually Plaintiff's roommate Audrey Jarvis emerged from her bedroom. [*Id.* at 69-71.] Baker then found Laielli naked and asleep in Plaintiff's bedroom. [*Id.* at 72-74.] Jarvis brought Laielli his clothes from the living room, and Laielli got dressed in Plaintiff's bedroom. After dressing, Laielli identified himself and explained to Baker what Plaintiff had to drink that night. [*Id.* at 75-77.] The only questions Baker recalls asking either Jarvis or Laielli were about what Plaintiff had ingested that evening. [*Id.* at 81.]

After approximately thirty minutes, Skillings and Lee arrived at the dormitory. [*Id.* at 83; Doc. No. 87-1 at 97.] Skillings asked Laielli if he and Plaintiff had consensual sex that night, and Laielli said yes. [Doc. No. 87-1 at 102-03; Doc. No. 91-3 at 90.] Baker took some photos of the living room and kitchen [Doc. No. 87-1 at 357-59; Doc. No. 87-11 at 27-32], but he did not preserve any of the alcohol or drink cups and glasses at the scene. [Doc. No. 91-3 at 87.] Nor did he cordon off the scene or take official statements from any of the residents or Laielli. [*Id.* at 93-95.] Skillings had Laielli gather his things and gave him a ride to his residence off campus. [Doc. No. 87-1 at 104, 306.]

### E.    Plaintiff Requests and Receives a SART Exam

In the ambulance on the way to the hospital, Plaintiff became upset and said she was raped. [*Id.* at 106.] At the hospital, Plaintiff spoke to Magdalene Wilhelm, the CARE advocate Lee had called, who reviewed the CARE process and completed a CARE report. [*Id.* at 395-96; Doc. No. 91-5 at 13-14.] Plaintiff and Goldman state Wilhelm attempted to dissuade Plaintiff from contacting the police. [Doc. No. 91-8 ¶ 7; Doc. No. 91-9 ¶ 14.]

4

After learning that Plaintiff decided to have a Sexual Assault Response Team ("SART") exam, Skillings asked his dispatcher to have an SDPD officer meet him at the hospital. [Doc. No. 87-1 at 108, 398-99; Doc. No. 91-2 at 92.]  SDPD Officer Joseph Nunez arrived at the hospital at approximately 5:19 a.m.  [Doc. No. 87-1 at 420-21.]  SDPD did not conduct any investigation at Plaintiff's dorm room that night.  [Doc. No. 91-5 at 26, 28-29, 32.]

### F.    USD's Actions In Response to Plaintiff's Report

#### 1.    The CIRT Meeting

USD Assistant Vice President of Student Wellness Moises Baron scheduled a Critical Incident Response Team ("CIRT") meeting for Monday, February 10th. [Doc. No. 87-1 at 213-14.]  That CIRT meeting recapped the events of Saturday night and Sunday morning and discussed some of the issues that might arise as a consequence.  [*Id.* at 221-23.]

#### 2.    No Contact Letters

After the CIRT meeting, USD Assistant Vice President for Student Affairs and Dean of Students Donald Goodwin issued no contact letters to Plaintiff, Laielli, Laplante, and Plaintiff's roommates.  [Doc. No. 87-10 at 2-3, 14, 16, 18, 20, 22, 25.]  Plaintiff was prohibited from contacting Laielli and prohibited from speaking with Laplante and her roommates about the case.  [*Id.* at 14, 16, 18, 20.] Laielli initially was only prohibited from speaking to Plaintiff.  [*Id.* at 22.]  One day later, the no contact order was expanded to prohibit Laielli from being on campus except to attend classes.  *See* [*Id.* at 25.]  A couple days after that, USD Associate Vice President, Chief Human Resources Officer, and then-Interim Title IX Coordinator Karen Briggs told Laielli he was allowed to be on campus for class projects and to be in open study spaces during breaks between classes.  [Doc. No. 91-4 at 50.]

#### 3.    Change in Housing

The CIRT meeting discussed whether the university would need to address a possible change in housing for Plaintiff.  [Doc. No. 87-1 at 222.]  Dayanne Izmirian, USD

Director of Residential Life, then contacted Plaintiff on February 10th and worked with Plaintiff and her mother from February 11 to 14 to locate a new residence for Plaintiff. [Doc. No. 87-1 at 13-15, 22-27, 31-34; Doc. No. 87-12 at ¶¶ 5-8.] Plaintiff states that the first locations presented as options "were not really viable options," either because the existing tenant in the unit didn't want a roommate or the unit was more expensive. [Doc. No. 87-1 at 14-15.] Plaintiff selected a new room on February 14th. [*Id.* at 34; Doc. No. 87-9 ¶ 6; Doc. No 87-12 ¶ 8.] There is some dispute about when the room was made available to Plaintiff, but she moved in within a week. [Doc. No. 87-1 at 35-36; Doc. No. 87-9 ¶¶ 5-6.]

### 4. Parking Permit

Plaintiff also sought an accommodation for parking on campus after the incident. There is a conflict about the exact type of accommodation requested, but Plaintiff and her mother state that Plaintiff sought an "all access" parking pass that would allow her to park near her classes at all times because of concern about her safety while walking to classes. [Doc. No. 87-1 at 20; Doc. No. 91-6 at 15, 27.] Izmirian testified that she informed Plaintiff by email that her existing pass allowed her to park on campus and access her classes by tram. [Doc. No. 87-1 at 452; Doc. No. 87-12 ¶ 6.] The email concluded, "Will this work for you?" [Doc. No. 87-1 at 452; Doc. No. 87-12 ¶ 6; *see id.* at 17.] Izmirian did not receive a written response to the email about the parking situation and assumed the concerns were satisfied. [Doc. No. 87-12 ¶ 6.] Plaintiff's mother testified that she responded to Izmirian in person later in the day and told her the options available with the existing pass did not work. [Doc. No. 91-6 at 15-17.] Plaintiff states that Izmirian told her mother that a broader permit would not be available to her. [*Id.* at 18.] She then states that Izmirian suggested Plaintiff could have campus security escort her to and from classes, or she could simply travel with a friend. [*Id.* at 18-21.]

### 5. Title IX Office

Plaintiff testified that no one at USD ever notified her of the Title IX office. Wilhelm and Briggs both attended the February 10th CIRT meeting and Wilhelm reported to Briggs

that Plaintiff had declined any support from the Title IX office. [Doc. No. 87-6 at ¶¶ 12-13; *see id.* at 46.] Plaintiff testified that she does not have a recollection of being advised of the Title IX office by Wilhelm at the hospital, nor was she made aware of Briggs, the Title IX coordinator, until around February 20th. [Doc. No. 91-9 ¶¶ 14, 28.] Plaintiff's mother contacted Wilhelm on February 11th. She informed Wilhelm Plaintiff did not want to speak to anyone at that point. [Doc. No. 87-16 at 22.] Wilhelm gave Plaintiff's mother the contact information for Briggs, Izmirian, Lee, and Godwin. [*Id.*] Wilhelm next checked-in with Plaintiff by text message on February 16th. [*Id.* at 11.]

Plaintiff contacted Wilhelm by text message on February 18th requesting information about individuals she could contact because of concerns she was falling behind in class. [*Id.*] Wilhelm referred Plaintiff to Godwin and Briggs. [*Id.* at 3, 12.] Plaintiff emailed Godwin expressing concerns because she had missed some classes, homework assignments, and quizzes. [Doc. No. 87-10 at 28.] Godwin responded by phone and told her he would email her professors requesting they show flexibility with Plaintiff's assignments, which he did. [Doc. No. 87-10 at 4, 30-31.] Briggs also contacted Plaintiff by email attempting to address her concerns. [Doc. No. 87-6 at 5, 48.] On February 20, 2014, Godwin sent an email to Plaintiff's professors stating that Plaintiff was dealing with a "difficult personal situation" and that "[a]ny flexibility or [sic] you can allow as she seeks to complete her academic work would be appreciated." [Doc. No. 87-10 at 31.]

### 6. Plaintiff Observes Laielli On Campus Following the Incident

Plaintiff testified to three instances of observing Laielli following her on campus after the incident. [Doc. No. 87-1 at 570; Doc. No. 91-9 ¶ 24.] On one instance she was walking either to or from class and saw Laielli within ten feet of her. [*Id.* at 570-71.] Plaintiff testified that she does not remember the date or the time of day of the encounter, but that she located the nearest public safety officer and told him that she was being followed by the guy that raped her and that a no contact order existed between the two. [*Id.*] Plaintiff states the officer said, "Oh," but otherwise didn't do anything. [*Id.*] Plaintiff did not immediately report this incident to anyone else from USD.

On another occasion, Plaintiff claims that Laielli followed her in his car. [*Id.* at 571-72.] After seeing Laielli, Plaintiff sprinted back to her dorm room but does not remember if she immediately reported the incident to any USD official. [*Id.* at 572.] On the third occasion, Plaintiff claims that she saw Laielli staring at her on campus. Plaintiff does not know how close Laielli got to her but testified that she got away as quickly as possible. [*Id.* at 573.] Laielli did not attempt to talk to her or otherwise engage with her during any of these events. [*Id.* at 579.]

Plaintiff testified she informed Wilhelm of these incidents but does not remember how or when she did so. [*Id.* at 569, 573.] Plaintiff states Wilhelm's general reaction to her reports was "Oh, I'm sorry." [*Id.* at 569; Doc. No. 91-9 ¶ 24.] Plaintiff also testified that she informed Dr. Baron that Laielli had been following her on campus in the context of her discussions with him about taking a leave of absence from USD. [Doc. No. 87-1 at 572.] According to Plaintiff, Baron responded by suggesting that perhaps the only way she would feel safe is to leave the school and it would be best if Plaintiff left USD. [*Id.* at 587-88.]

### G.    DPS Investigation and the CIB Hearing

SDPD Detective Tracey Barr investigated Plaintiff's complaint. [Doc. No. 87-1 at 150.] Barr instructed USD to delay the university's investigation until the conclusion of the ongoing SDPD investigation. [*Id.* at 149-50, 172.] Barr recommended that Laielli be charged and arrested, but the District Attorney ultimately decided to not prosecute Laielli. [*Id.* at 175-76, 203-04.] SDPD then authorized DPS to resume its investigation on April 3rd. [*Id.* at 183-84.]

On May 7th, Marie Minnick, USD Assistant Dean of Students, received the complete DPS file on the incident. [*Id.* at 493-94; Doc. No. 87-11 at 8-34; Doc. No. 87-14 ¶ 2.] Minnick scheduled a Critical Issues Board ("CIB") hearing for May 30th and sent letters to Laielli and Plaintiff to notify them of their requested participation. [Doc. No. 87-14 at 2, 23, 27.] In response to the notice of the hearing, Plaintiff informed Minnick she had left San Diego and was not going to be physically present for the hearing. [Doc. No.

87-1 at 47, 496; Doc. No. 87-14 ¶ 6.] Plaintiff asked to participate by videoconference, but Minnick denied the request, relying on existing policy prohibiting participation by individuals not physically present at the hearing. [Doc. No. 87-1 at 47-48, 496-99; Doc. No. 87-14 ¶ 4.] Minnick told Plaintiff she could submit a response to Laielli's statement and a "statement of impact" that would detail the effect of the incident which would be read aloud at the CIB hearing. Plaintiff submitted a statement of impact for the hearing. [Doc. No. 87-1 at 500-01; Doc. No. 87-14 3, 33-36.]

Following the May 30th hearing, the CIB Board issued a decision finding by a preponderance of the evidence Laielli had not committed a sexual assault. [*Id.* at 522; Doc. No. 87-14 ¶ 9.] Minnick notified Plaintiff of the decision of the board and informed her of her right to appeal. [Doc. No. 87-14 at 3, 40.] Plaintiff did not appeal the decision. [*Id.* at ¶ 10.]

## II. Legal Standards on Motions for Summary Judgment

The familiar summary judgment standard applies here. A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To avoid summary judgment, disputes must be both 1) material, meaning concerning facts that are relevant and necessary and that might affect the outcome of the action under governing law, and 2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (citing *Anderson*, 477 U.S. at 248).

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *See Celotex Corp.*, 477 U.S. at 322-323. If the moving party can demonstrate that its opponent has not made a sufficient showing on an essential element of his case, the burden shifts to the opposing party to set forth facts showing that a genuine

issue of disputed fact remains. *Id.* at 324. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. Request for Judicial Notice and Evidentiary Objections

USD requests judicial notice of three documents: (1) the First Report of the White House Task Force to Protect Students from Sexual Assault [Doc. No. 87-1 at 611-633]; (2) an article from the *Wall Street Journal* [Doc. No. 87-1 at 635-638]; and (3) a United States Department of Education, Office for Civil Rights, "Dear Colleague Letter" dated April 4, 2011 (the "DCL") [Doc. No. 87-1 at 640-658]. Plaintiff opposes notice of the first two documents on the grounds that "[t]hey are improper hearsay and improper opinion." [Doc. No. 91-11 at 1.] USD's request is granted as unopposed with respect to the DCL. As for the other two documents, the request is denied as moot because the Court did not need to consider either document in connection with this opinion.

Plaintiff also moved to strike portions of several of the declarations submitted with USD's motion. [Doc. No. 91-11.] Because Plaintiff's motion does not assert any valid bases for striking the declarations in question, the motion is denied.

### IV. Discussion

Plaintiff brings two claims against USD for violation of Title IX. Title IX states in relevant part that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Title IX creates an implied private right of action for victims of discrimination on the basis of sex. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 708 (1979).

[A] university can be held liable for violating Title IX in connection with peer-on-peer harassment only in "limited circumstances," where five requirements are met. First, a school is liable "only for its own misconduct," so the institution must "exercise[] substantial control over both the harasser and the context in which the known harassment occurs." Second, the survivor must

have suffered harassment "so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school." Third, the institution must have had "actual knowledge" of the harassment. Fourth, the institution must have acted with "deliberate indifference" to the known harassment. Fifth, this deliberate indifference must "cause students to undergo harassment or make them liable or vulnerable to it."

*Moore v. Regents of the Univ. of Cal.*, No. 15-cv-05779-RS, 2016 WL 4917103, at *3 (N.D. Cal. Sept. 15, 2016) (second and third alterations in original) (internal citations omitted) (citing *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640, 643, 645, 650-51 (1999)). In its motion, USD argues only that it is entitled to summary judgment because Plaintiff is unable to satisfy the fourth requirement—that USD acted with deliberate indifference to her rape claim.[4] Although Plaintiff disputes USD's characterization of her two Title IX claims as "duplicative," she does not dispute that both of her claims require deliberate indifference by USD.

_____

[4] Because USD limits its argument to this one element of a Title IX claim, the Court bases its decision solely on the lack of evidence supporting a finding that USD acted with deliberate indifference. However, it is questionable that the facts would support a finding that several of the other requirements of a Title IX claim are satisfied either. As for the first requirement, although the assault took place on campus and was committed by a student, it occurred in Plaintiff's dorm room on the weekend and the student had been invited into the room. There is no evidence concerning whether USD had sufficient control over the conduct of an invited guest into a dorm room on campus over a weekend to expose it to liability related to its response to misconduct that occurred in that context. *Cf. Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) (noting that there was no evidence whether the defendant university had control over student conduct at an off campus party).

As for the second requirement, "in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Davis*, 526 U.S. at 652. A single assault, not preceded by any harassing behavior from the assailant, is severe and objectively offensive, but it is not pervasive harassment. Accordingly, it is hardly clear that the harassing conduct here (the assault on the morning of February 9) had "the systemic effect of denying [Plaintiff] equal access to an educational program or activity" at USD. *Id.* at 652-53 ("Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.").

"Institutions 'are deemed "deliberately indifferent" to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Moore*, 2016 WL 4917103, at *3 (quoting *Davis*, 526 U.S. at 648). Deliberate indifference "requires a showing of a response that was more deficient than merely 'negligent, lazy, or careless.'" *Id.* (quoting *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). It requires an "official decision . . . not to remedy the situation." *Oden*, 440 F.3d at 1089 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). "Significantly, Title IX does not require that an institution 'remedy' peer harassment, but simply that it 'respond to known peer harassment in a manner that is not clearly unreasonable.'" *Butters v. James Madison Univ.*, 208 F.Supp. 3d 745, 754 (W.D. Va. 2016) (quoting *Davis*, 526 U.S. at 648-29).[5]

## A. Three Hour Delay Before Involving SDPD

Viewing all evidence in favor of Plaintiff, Plaintiff first encountered Skillings shortly before 2:00 am on February 9, 2014. Shortly thereafter, Skillings was aware of Plaintiff's claim that she had been or may have been raped by Laielli. Skillings then contacted Lee, who upon learning of Plaintiff's claim that she was drugged and raped, contacted a CARE advocate to meet with Plaintiff. Skillings also called paramedics who took Plaintiff to the hospital. While she was at the hospital, Plaintiff met with the CARE advocate and told her that she wanted to call the SDPD. Upon learning of Plaintiff's request, Skillings arranged

---

[5] At the hearing, Plaintiff's counsel argued that there is no "bright line rule" concerning what constitutes deliberate indifference. The Court generally agrees and has not employed any bright line rules in connection with the instant determination of whether there is any evidence that USD acted with deliberate indifference in response to Plaintiff's rape claim. Plaintiff's counsel also argued at the hearing that in the tentative order provided to the parties in advance of the hearing, the Court failed to consider certain cases, including: *Doe A. v. Green*, 298 F.Supp.2d 1025 (D.Nev. 2004); *S.S. v. Alexander*, 143 Wash. App. 75, 177 P.3d 724 (2008); and *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir. 2000). However, the Court has reviewed each of these cases, as well as others that are not cited herein. None of these cases are binding on this Court. Moreover, the facts in every Title IX case are unique, and the Title IX recipients' response to the students' claims in each of the aforementioned cases were completely different from USD's response to Plaintiff's sexual assault report here. As such, none of these cases supports Plaintiff's argument that USD acted with deliberate indifference to her sexual assault report or warrant discussion herein.

for an SDPD officer meet him at the hospital. SDPD officer Nunez met Skillings at the hospital a little after 5:00 am. None of these facts are disputed.

Plaintiff argues that the approximate three hour delay between when Skillings became aware of her rape claim and when the SDPD was first contacted demonstrates deliberate indifference. The Court is not persuaded. Skillings and Lee did not ignore Plaintiff's claim. They called paramedics to provide medical attention to Plaintiff. They went to Plaintiff's dorm room to look for evidence of the drugs Plaintiff claimed Laielli put in her drink. They also called a CARE advocate pursuant to a policy that was endorsed by SDPD and CCS and which was reviewed and approved by a Deputy City Attorney. [Doc. No. 87-1 at 682-83; Doc. No. 87-13 at 2, 10-18.] Plaintiff may disagree with this policy, but "[a] showing that [USD] did not employ the best practices or even that it was negligent is insufficient." *Butters*, 208 F.Supp. 3d at 755. Even if Skillings or Lee could have and should have called the SDPD sooner based on the 1999 MOU or the 2013 MOU, there is no evidence that their failure to do so was anything other than negligent or careless. *Cf. Gebser*, 524 U.S. at 291-92 (noting that a school district's "failure to comply with . . . regulations . . . does not establish the requisite . . . deliberate indifference). Accordingly, the fact that almost three hours passed between when Plaintiff first told DPS officer Skillings about the assault and when Skillings arranged for the SDPD to be called does not create an inference of deliberate indifference by USD.

### B. DPS's Handling of Plaintiff's Dormitory Room

Plaintiff argues that Baker's and Skillings' handling of Plaintiff's dorm room and interactions with Laielli and Plaintiff's roommate demonstrate deliberate indifference because they did not comply with police procedures. Plaintiff complains that "USD contaminated the crime scenes, didn't bother to interview or interrogate the suspect or witnesses, and drove the suspect home . . . ." [Doc. No. 91 at 26.] In particular, Plaintiff argues that the failure to take formal statements from Laielli and Plaintiff's roommates, and the failure to preserve evidence in the dorm room, including cups that could contain evidence to support Plaintiff's claim that Laielli drugged her, demonstrate deliberate

indifference.  However, DPS officer Baker, with whom Plaintiff places the most blame for the lack of preservation of evidence in the dorm room, was not aware of Plaintiff's rape claim when he first entered the room.  Further, although Plaintiff is critical of the DPS for driving Laielli home that morning, removing Laielli from Plaintiff's dorm room does not demonstrate deliberate indifference to Plaintiff.

Plaintiff is critical of the DPS officers' actions in the early morning hours of February 9, 2014, but that criticism is not evidence that would allow an inference that in the immediate aftermath of Plaintiff's report that she was raped, any USD employees were indifferent to Plaintiff's allegations of rape or were deliberately trying to sabotage her claim.  Baker, Skillings, and the other USD individuals involved that morning are not police officers, and Title IX does not require them or USD to follow police procedures when responding to a sexual assault report.  That the officers did not follow police procedures or were otherwise inept or ineffective in looking for evidence related to Plaintiff's assault is at most evidence of negligence or carelessness.  *Cf. Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011) ("Ineffective responses, however, are not necessarily clearly unreasonable.").  Thus, regardless of whether DPS's actions in Plaintiff's dorm room that morning complied with police procedure, they do not permit an inference that USD deliberately attempted "to sabotage Plaintiff's complaint or its orderly resolution." *Oden*, 440 F.3d at 1089.[6]

_____

[6] USD does not make the argument (and the Court does not grant summary judgment on this ground), but it is unlikely that USD could be held liable under Title IX based the DPS officers' actions in Plaintiff's dorm room on the night of the assault, even if those actions met the standard of deliberate indifference, because DPS officers were not acting at the specific direction of USD officials with actual knowledge of the assault.  Any liability of USD itself for the DPS officers' actions that evening would presumably be based on *respondeat superior* or constructive notice, and the Supreme Court has held that "Congress did not intend to allow recovery in damages [under Title IX] where liability rests solely on principles of vicarious liability or constructive notice." *See Gebser*, 524 U.S. at 288; *see also Oden*, 440 F.3d at 1089 (noting that in *Gebser*, "[t]he [Supreme] Court expressly declined to impose [Title IX] liability on 'principles of respondeat superior or constructive notice,' instead demanding actual notice to an official of the defendant.").  Put differently, because no USD official had "actual knowledge" of the assault based on Plaintiff's initial report to Skillings, USD could not have made an official decision not to remedy the

In sum, viewing all of the facts in a light most favorable to Plaintiff, USD learned of Plaintiff's claim that she had been drugged and raped around 2:00 am on February 9, 2014. In response, USD called an ambulance to take Plaintiff to the hospital, and contacted a CARE advocate. USD also went to Plaintiff's dorm room to look for evidence of her being drugged. Further, when Plaintiff told the CARE advocate that she wanted to involve the SDPD, USD called the SDPD, and shortly after 5:00 am, an SDPD officer arrived at the hospital. Notwithstanding Plaintiff's claim that USD could have taken better measures to ensure that Plaintiff's dorm room was left in the state it was in when Plaintiff left it earlier that night, and even if USD should have called the SDPD at 2:00 am instead of 4:40 am, the evidence does not support a finding that USD was deliberately indifferent to Plaintiff's rape claim based on its actions on the morning of February 9, 2014.

### C. USD's Response to Plaintiff's Requests After the Assault

Plaintiff also argues that USD violated Title IX in connection with its response to her requests for accommodation in the days and weeks following the assault. None of the evidence upon which Plaintiff relies demonstrates deliberate indifference.

### 1. No Contact Letters

Plaintiff argues the nature of the no contact letters issued to Plaintiff and Laielli was unreasonable. Plaintiff's objection to the no contact letters seems to be that Plaintiff was restricted from speaking to her roommates and friends about the incident while Laielli was not, and because the restrictions on Laielli from being on campus were later "watered down." [Doc. No. 91 at 18-19.] However, Plaintiff's unhappiness with the specific extent of the restrictions set forth in the letters does not mean they reflect deliberate indifference by USD. To the contrary, the existence of these letters demonstrates that USD was not indifferent to Plaintiff's claims and that USD was taking measures to limit Laielli's presence on campus and ability to harass Plaintiff in the future, and to preserve the integrity

---

violation. *See Gebser*, 524 U.S. at 290 (likening deliberate indifference to "an official decision by the recipient not to remedy the violation").

of the investigation into Plaintiff's claims.  Further, Plaintiff's arguments about the terms of Laielli's letter ignore the fact that USD had to consider not only Plaintiff's concerns, but also Laielli's rights.  *See Butters*, 208 F.Supp. 3d at 759.  Accordingly, any differences between the no contact letters issued to Plaintiff and Laielli and the extent of the restrictions placed on Laielli do not support a finding that USD acted with deliberate indifference.

## 2.    Change in Housing

Plaintiff complains about USD's conduct in accommodating a change in housing after the incident.  However, the undisputed facts show that Izmirian contacted Plaintiff or her mother by February 10th, that USD offered Plaintiff several housing options, and that Plaintiff selected a unit that was acceptable on February 14th and moved in the next week. [*Id.* at 35.]  In other words, Plaintiff asked for new housing and was able to move into new housing within approximately eight days of the assault.  Plaintiff may have been unhappy that USD did not find housing she deemed acceptable sooner, but there is simply no evidence that USD was indifferent to Plaintiff's request, let alone deliberately indifferent. *Cf. Moore*, 2016 WL 4917103, at *5 (holding no deliberate indifference when school responded to housing request within days of the incidence even though school declined to provide the accommodations sought by the plaintiff).

## 3.    Parking Permit

Plaintiff also argues that USD was deliberately indifferent because it refused to give her a certain type of parking pass that she requested.  After the incident, Plaintiff sought a broader parking pass that would allow her to park, essentially, anywhere on campus because she felt unsafe.  Although there is some dispute about how USD responded to Plaintiff's request, even viewing the evidence favorably to Plaintiff does not support a finding that USD was deliberately indifferent.  "An aggrieved party is not entitled to the precise remedy that he or she would prefer."  *Oden*, 440 F.3d at 1089.  Although Plaintiff did not receive the type of parking pass she sought, USD attempted to remedy Plaintiff's concerns by offering a security guard to escort her for her walks on campus and notifying her of other options that could ameliorate her concerns.  [Doc. No. 91-6 at 18.]  *Oden*, 440

F.3d at 1089.  Accordingly, Plaintiff's version of USD's response to her parking concerns does not support a finding of deliberate indifference.

### 4.  Rescheduling Quizzes or Exams

Plaintiff also points to USD's actions in connection with her request for help rescheduling quizzes as evidence of deliberate indifference.  However, in response to Plaintiff's request for assistance, Godwin sent an email to her professors asking them to show flexibility with respect to her completing her academic work.  [Doc. No. 87-10 at 30-31.]  Plaintiff testified in her deposition that, notwithstanding Godwin's request, some of her professors refused to allow her to make up quizzes she missed [Doc. No. 87-1 at 602-603], but Plaintiff did not raise this concern with Godwin or Briggs.  As was the case with Plaintiff's other requests, the mere fact that USD did not give her the exact accommodation she requested is not evidence of deliberate indifference.  Moreover, USD cannot be held liable under Title IX for the actions of employees of which USD officials were unaware.  *Gebser*, 524 U.S. at 290.

USD also "may not be liable for damages unless its deliberate indifference 'subjects' its students to harassment."  *Davis*, 526 U.S. at 644-45.  USD's deliberate indifference must have caused Plaintiff "to undergo harassment or make [her] liable or vulnerable to it."  *Id.* at 645.  Plaintiff does not explain how failing to grant a request to make up a quiz subjected her to harassment.  Accordingly, USD's actions in response to Plaintiff's academic concerns do not reflect deliberate indifference by USD.  *Cf. Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) (holding that because "[t]here is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations," it "cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

### 5.  Title IX Office

Plaintiff argues liability should be imposed on USD because of perceived defects in USD's Title IX office.  Plaintiff alleges three administrative defects in USD's Title IX Office: (1) USD did not have in place a Title IX compliant policy; (2) USD did not have a

"named" officer for complying with 34 C.F.R. § 106.8(a); and (3) Plaintiff was not given "updates" of the Title IX process. [Doc. No. 91 at 16.]

Along these lines, Plaintiff points to the alleged failure of Wilhelm to notify her of the Title IX coordinator as she reviewed the CARE advocate report checklist at the hospital with Plaintiff. However, there is no dispute that USD held a CIRT meeting on the morning of February 10th that was attended by both Wilhelm and Interim Title IX Coordinator Briggs to address the assault. [Doc. No. 87-1 at 407; Doc. No. 91-4 at 22.] There is also no dispute that Briggs contacted Plaintiff no later than February 20th to discuss academic accommodations. [Doc. No. 87-6 at 5, 48; Doc. No. 91-4 at 35.]

"[A]lleged failure to comply with [Title IX] regulations . . . does not establish the requisite . . . deliberate indifference." *Gebser*, 524 U.S. at 291-92 ("We have never held . . . that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements."); *Roe*, 746 F.3d at 883 ("[T]he Supreme Court has cautioned that 'alleged failure to comply with the [Title IX] regulations' does not establish actual notice and deliberate indifference and it has never held that 'the implied private right of action under Title IX allows recovery in damages for violation of [such] administrative requirements.'") (quoting *Gebser*, 524 U.S. at 291-92). The only relevant inquiry when a plaintiff seeks retroactive damages against a Title IX funding recipient is whether the recipient demonstrated deliberate indifference to known instances of sexual harassment. *Davis*, 526 U.S. at 643. Even assuming Wilhelm did not inform Plaintiff of the Title IX coordinator and Briggs wholly failed to contact Plaintiff for eleven days after the incident, this evidence does not support an inference of deliberate indifference in light of USD's response to Plaintiff's rape claim and requests for accommodation as a whole. *Cf. Roe*, 746 F.3d at 883 (holding a complete failure to involve the Title IX office in a rape investigation was not deliberate indifference). Accordingly, to the extent any of USD's actions did not comply with Title IX regulations or policies, such non-compliance does not support Plaintiff's Title IX claims.

### 6. Allegations of Laielli Following Plaintiff on Campus

Plaintiff alleges that USD's responses to her reports of seeing Laielli on campus three times in the weeks following the assault demonstrate deliberate indifference. However, Plaintiff testified that Laielli never attempted to approach, speak to, threaten or otherwise contact her. Moreover, to recover damages, Plaintiff must prove that a USD official "who at a minimum has authority to institute corrective measures on [USD's] behalf, has actual notice of, and is deliberately indifferent to," the misconduct. *Gebser*, 524 U.S. at 277. Plaintiff did not immediately report any these instances where she saw Laielli to officials at USD with prior knowledge of the assault and with power to take action. She testified that before she left USD, she reported one or all of the times she saw Laielli to (1) a DPS officer whose name she does not remember, [Doc. No. 87-1 at 570-71], (2) Wilhelm, who was her student CARE advocate, and (3) Baron.[7] [*Id.* at 569, 573.] There is no evidence that the DPS officer had any prior knowledge that Laielli had previously assaulted her, and though Plaintiff claims that she told him about the assault and no contact letter, Laielli was no longer following her at this point. Further, USD cannot be held liable for any lack of action of this unnamed DPS officer absent some evidence that the officer acted pursuant to a USD policy. *See Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1292 (10th Cir. 2017) (holding that university could not be held liable for deliberate indifference based on report of rape to campus security officers because campus security officers were not officials with authority to take corrective action on behalf of the university); *see also Davis*, 526 U.S. at 643 ("The high standard imposed in *Gebser* sought to eliminate any 'risk that the recipient [of Title IX funding] would be liable in damages not for its own official decision but instead for its employees' independent actions.'") (quoting *Gebser*, 524 U.S. at 290-91). Wilhelm, meanwhile, was a student, not a USD

---

[7] In a declaration accompanying her motion, Plaintiff states that she told DPS officer Ryan Hansen that Laielli had been following her when he interviewed her on May 6, 2014, as part of USD's investigation of the events of February 9, 2014. However, she had already left school at this time. [Doc. No. 87-1 at 44-46.]

official with power to take action on behalf of USD. Only Baron conceivably had the authority to institute corrective measures on USD's behalf, but Plaintiff only told him weeks after the fact and when she was already considering leaving school.

In any event, while Plaintiff may have wished to never see Laielli again, it was not feasible to prevent Laielli from being on campus entirely considering that he was still a student at USD. *Cf. Kelly v. Yale Univ.,* No. CIV.A. 3:01-CV-1591, 2003 WL 1563424, at *5 (D. Conn. Mar. 26, 2003) (noting a university may not be able to prevent a student accused of harassment from attending classes before any finding of wrongdoing on the part of the student without exposing itself to liability). Ultimately, although seeing Laielli on campus was undoubtedly disturbing to Plaintiff, that USD did not take additional measures against Laielli based on Plaintiff's reports of the three times she saw Laielli over the six weeks since the assault does not demonstrate deliberate indifference. *See generally Oden*, 440 F.3d at 1087, 1089 (finding two instances where the plaintiff encountered the accused harasser on campus did not demonstrate deliberate indifference on the part of the university); *cf. Butters*, 208 F. Supp. 3d at 762 (holding that the university was not deliberately indifferent based on the plaintiff seeing her attackers off-campus when they did not contact her and she saw them in a place outside of university control).

### 7. The CIB Hearing

Plaintiff alleges several respects in which the CIB hearing was deficient. [Doc. No. 91 at 22-23.] However, the deliberate indifference standard does not impose specific administrative or remedial requirements on a school. *See Davis*, 526 U.S. at 648. Therefore, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* at 648. "[W]hether [USD] could have designed a more victim-friendly system, whether it could have taken steps to protect [Plaintiff] better, or even whether [USD] followed its own policy to the letter, are not dispositive. . . . Instead, the sole question is whether [USD]'s response was 'clearly unreasonable.'" *Butters*, 208 F.Supp. 3d at 763 (citing *Oden*, 440 F.3d at 1089).

Here, USD delayed its investigation until the resolution of SDPD's criminal investigation at the request of SDPD Detective Barr. [Doc. No. 87-1 at 149-50, 172.] USD then resumed its investigation after receiving authorization from the SDPD on April 3rd. [*Id.* at 183-84.] The CIB hearing took place less than two months later. [Doc. No. 87-1 at 312, 505.] Plaintiff received notice of the hearing a week in advance but did not attend or ask that the hearing be continued to a date on which she could attend. Although USD prohibited Plaintiff from appearing via videoconference pursuant to policy,[8] she was allowed to (and did) submit a written impact statement. Moreover, Plaintiff was given the opportunity to appeal the decision of the CIB and declined to do so. These facts do not reflect deliberate indifference by USD in connection with its internal investigation of Plaintiff's allegations and the CIB hearing itself. *Oden*, 440 F.3d at 1089 (noting nine-month delay before administrative hearing was not more than negligent, lazy, or careless); *cf. Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 (10th Cir. 2008) (holding that school district could not be faulted for letting police take the lead in the investigation of harassment of a student that occurred off school grounds).

## V.    Conclusion

What Plaintiff experienced in the early morning hours of February 9, 2014, was undoubtedly traumatic, and the Court can empathize with any frustration Plaintiff felt in the aftermath of that experience. However, USD is not liable for the sexual assault itself, and the evidence does not demonstrate any indifference on the part of USD to Plaintiff's assault claim and resulting trauma. Within three hours of Plaintiff's encounter with DPS officer Skillings after the assault, Plaintiff had been provided medical attention and a CARE advocate, security had removed the alleged perpetrator from her dorm room, and the San Diego Police Department had been contacted. Shortly thereafter, USD limited the

---

[8] USD's policy was that only USD community members were permitted to attend CIB hearings. Remote participation by videoconference was prohibited because it would not be possible for the board to know whether unauthorized persons were present with the person participating remotely and because it impacted the board members' credibility determinations. [Doc. No. 87-1 at 499-500; 87-14 at 2.]

alleged perpetrator's access to the campus and barred him from contacting Plaintiff. USD also responded to Plaintiff's concerns about her living arrangements, her academic work, and parking on campus. USD's response may not have been perfect and it may not have done everything that Plaintiff would have liked, but that is not the standard for a Title IX claim. No reasonable juror could find that USD did not take Plaintiff's complaint seriously, that it was attempting to sabotage her complaint, that it did not attempt to address her concerns in the days and weeks following the incident, or that any of USD's actions, in isolation or in general, were "clearly unreasonable." The lack of evidence of deliberate indifference by USD is fatal to Plaintiff's Title IX claims. Accordingly, it is hereby **ORDERED** that USD's motion for summary judgment is **GRANTED**.

In light of the foregoing, the parties motions to exclude testimony [Doc. Nos. 83, 84, 85, 86, and 96] are all **DENIED AS MOOT**. The Clerk of Court is instructed to enter judgment for USD.

It is **SO ORDERED**.

Dated: August 4, 2017

_____
Hon. Cathy Ann Bencivengo
United States District Judge